# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 23-1791V

| | |
|---|---|
| CHRISTIE TRAHAN, | Chief Special Master Corcoran |
| Petitioner, | Filed: December 9, 2025 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Daniel Alholm, Alholm Law, P.C., Chicago, IL, for Petitioner.*

*Michael Bliley, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT[1]

On October 12, 2023, Christie Trahan filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), later amending her claim (ECF No. 6). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza vaccine received on December 20, 2021. Amended Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons discussed below, I find that Petitioner more likely than not suffered the residual effects of her alleged vaccine-related injury for more than six months, and

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

that she has satisfied all of the requirements for a Table SIRVA claim. She is therefore entitled to compensation under the Vaccine Act.

## I.  Relevant Procedural History

On July 1, 2024, Respondent filed his Rule 4(c) Report arguing in part that the Vaccine Act's "severity requirement" was not met. Rule 4(c) Report at 6. Petitioner subsequently filed a Motion for Ruling on the Record ("Mot.") on September 9, 2024. ECF No. 23. Respondent filed a response ("Resp.") on November 8, 2024, and Petitioner filed a reply ("Repl.") on November 15, 2024. ECF No. 24-25. The matter is now ripe for adjudication.

## II.  Relevant Facts

### A.  Medical Records

Petitioner received a flu vaccine in her left deltoid on December 20, 2021. Ex. 3 at 3. Approximately three weeks later (January 13, 2022), Petitioner sought treatment from an orthopedist. Ex. 6 at 59. She reported left shoulder pain "after being given a flu shot on 12/20/2021." *Id*. On exam, Petitioner had tenderness and crepitus, decreased range of motion due to pain, and positive impingement signs. *Id*. at 60. She was diagnosed with subacromial bursitis and referred to occupational therapy. *Id*.

The following day, Petitioner submitted a report to the Vaccine Adverse Event Reporting System. Ex. 5. She reported the date of onset as "12/21/2021," the day after vaccination. *Id*. at 4.

Ms. Trahan began occupational therapy on January 17, 2022. Ex. 6 at 40. She complained of "post-injection bursitis" that caused limited use of her left shoulder along with weakness and stiffness. *Id.* The therapist noted that Petitioner "reported feeling immediate, sharp pain to L shoulder at time of injection." *Id*. at 41. On exam, she displayed "concerns for development of secondary adhesive capsulitis." *Id*. Treatment was planned for eight visits over four weeks. *Id*. She returned for a second treatment on January 26, 2022. Ex. 8 at 330. At that visit, she reported that "starting therapy really helped [her] arm move and feel better." *Id*.

There is a subsequent and lengthy treatment gap of over ten months. In that interval, Petitioner obtained an ob/gyn examination on August 15, 2022. Ex. 9 at 25. She also sought urgent care in September 2022 for a Covid-19 infection (Ex. 13 at 1) and later that same month was diagnosed with bronchitis. Ex. 11 at 7. She also received another flu vaccine in October 2022 (Ex. 12 at 8), and saw her primary care provider ("PCP") for

2

high cholesterol that was discovered in the bloodwork ordered by her ob/gyn. *Id.* at 54. None of the records from these encounters include reference to shoulder pain.

Petitioner returned to her orthopedist for shoudler-specific treatment on December 15, 2022. Ex. 6 at 55. She was seen for a "follow-up evaluation" and reported that her "symptoms [had] been present for approximately 1 year." *Id*. Her exam included full range of motion with pain, crepitus, tenderness, and positive impingement testing. *Id*. at 56. She was diagnosed with bursitis and impingement syndrome. *Id*. An MRI revealed mild superior spurring of the acromioclavicular joint, mild bursitis, and rotator cuff tendinosis. *Id*. at 28.

Petitioner returned to her orthopedist on January 5, 2023 to review the MRI results. Ex. 6 at 52. She was given a cortisone injection and a home exercise program. *Id.* at 53. She subsequently continued to treat her left shoulder symptoms through the remainder of 2023, with physical therapy and later surgery. *See* Ex. 6, Ex. 8.

### B. Relevant Witness Testimony

Petitioner filed a declaration on October 24, 2023, and a supplemental declaration on September 9, 2024. Ex. 4, 14. She states that she "woke up with extreme pain in [her] left shoulder" the morning after her vaccination. Ex. 14 at ¶1. At the time of her vaccination, she had a high deductible insurance plan, requiring her to pay up to $7,070.00 in medical expenses per year. Ex. 4 at ¶4; Ex. 14 at ¶3. She paid out-of-pocket for the initial treatment for her left shoudler pain, but then determined that it was too expensive to continue. *Id*. She explained that her husband's hours had been reduced due during the Pandemic, causing the family to go into debt. *Id*. She felt that her "only option was to try to heal [herself] with a physical therapy program [she] received from [her] doctors, rest, exercises and hot and cold compresses." *Id.* at ¶2. As a result of the associated costs, Petitioner would "only go to the doctor when absolutely necessary." *Id*. at ¶3.

In May 2022, Petitioner's husband obtained a new job which provided comprehensive medical insurance "for the first time ever." Ex. 14 at ¶3. Petitioner explains that once she had health insurance, she tried to be more "proactive" about her health, starting with screenings for "any serious health issues that could be life threatening." *Id*. at ¶6. She noted that "it had been over a decade since [she] had a routine comprehensive medical exam," and that "although [her] shoulder hurt, [she] knew [she] wasn't going to die from it." *Id*. After addressing her overall health, including seeing an ob/gyn and PCP for high cholesterol, Petitioner returned to treatment for her left shoulder. *Id*. at ¶5-7.

Nicholas Trahan, Petitioner's husband, also filed a declaration in support of Petitioner's claim. *See* Ex. 15. He stated that his employer at the time of Petitioner's vaccination did not offer medical insurance, so they had only a high-deductible plan to

cover emergencies. *Id*. at ¶4. He noted that they "rarely went to the doctor." *Id*. During the Covid-19 Pandemic, Mr. Trahan's hours were cut, which led to the family "having to take on debt." *Id*. at ¶5. He stated that Petitioner did not suffer any "new or additional left shoulder injuries" during her gap in formal treatment. *Id*. at ¶7.[3]

### III.     Applicable Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove by a preponderance of the evidence the matters required in the petition by Vaccine Act Section 11(c)(1). The Vaccine Act also requires that a petitioner demonstrate that "residual effects or complications" of a vaccine-related injury continued for more than six months. Vaccine Act §11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. §13(a)(1)(A). "[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013V, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014).

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the

---

[3] Mr. Trahan's Affidavit contains paragraphs numbered 5, 6, and 5. Therefore, the second paragraph labeled "5" will be noted herein as "7." *See* Ex. 15 at 3.

4

patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### IV.   Findings of Fact - Severity

To satisfy the statutory severity requirement, Petitioner must demonstrate that her symptoms more likely than not continued until at least June 21, 2022 – six months after the onset of her pain on December 21, 2021 (the day after vaccination). *See* Ex. 14 at ¶1. The record establishes (and the parties agree) that Petitioner treated her left shoulder pain with one orthopedist visit and two physical therapy appointments through January 26, 2022, just over one month after her vaccination. Petitioner then did not seek shoulder-related care again for almost 11 months. Respondent contends that Petitioner has not provided preponderant evidence that her vaccine-related symptoms persisted for at least six months because she had "multiple intervening medical appointments where she did

not report any left shoulder pain or limitations." Resp. at 7-9. Respondent further contends that Petitioner's intervening medical appointments indicate that she did not have financial constraints that limited her ability to seek care for her shoulder. *Id*. at 9.

When Petitioner first began physical therapy, treatment was planned for eight sessions over four weeks. Ex. 6 at 40. Although she did not complete the planned therapy, Petitioner has provided a credible explanation for why she did not seek further treatment at that time. Petitioner explains that her high-deductible insurance plan (which required substantial out-of-pocket payments) made her highly reluctant to seek care. Ex. 4 at ¶4; Ex. 14 at ¶2; *See also* Ex. 15 at ¶4-5. Petitioner also states that she tried to self-treat her left shoulder pain with exercises, rest, heat and cold, and that she hoped it would resolve on its own. Ex. 4 at ¶4; Ex. 14 at ¶2.

When Petitioner returned to treatment after the gap, she was seen for a "follow-up evaluation," and reported that her "sytmpoms [had] beem present for approximately 1 year." Ex. 6 at 55. She was diagnosed with bursitis (the same diagnosis as her initial visit soon after vaccination) and impingement syndrome. *Id*. at 56. In addition, at the time of Petitioner's last physical therapy treatment on January 26, 2022, she had not met any of her therapy goals and treatment was planned into the future. Ex. 8 at 330. Although Respondent notes that Petitioner reported improvement during that early 2022 appointment, there is no evidence that Petitioner's shoulder pain had resolved at that time, or any time prior to her follow-up treatment in December 2022. Further, Respondent does not point to any evidence in the record of an alternative cause for her symptoms since the flu shot.

Respondent highlights the fact that Petitioner had several medical visits during the intervening period during which she did not complain of shoulder pain. Resp. at 7. But these medical visits were not necessarily occasions on which a person would have been expected to report her shoulder pain. *See* Ex. 9 at 25 (ob/gyn exam); Ex. 11 at 7 (urgent care visit for bronchitis); Ex 12 at 8 (vaccinations, without any appointment record); Ex. 13 at 1 (urgent care visit for Covid-19 infection). Petitioner also saw a new PCP on October 31, 2022 for high cholesterol that was found during bloodwork done by her ob/gyn. Ex. 12 at 54. But Petitioner maintains that because she had already seen an orthopedist, she did not discuss her shoulder pain with the PCP. Ex. 14 at ¶5. Petitioner explained why she sought treatment in this manner – she was attempting to catch up on routine medical care and screenings that she was unable to do prior to having comprehensive insurance before addressing her ongoing shoulder pain because she "knew [she] wasn't going to die" from her shoulder pain. *Id*. at ¶6. She explained that once she had "addressed her overall health," she returned to treatment. *Id*. at ¶7.

Respondent argues that this case is analogous to *Black v. Sec'y of Health & Human Servs*, No. 21-0009V, 2023 WL 4446500 (Fed. Cl. Spec. Mstr. May 22, 2023) in

which there was a gap in treatment for more than 17 months. Resp. at 7-8. But *Black* is distinguishable. That claimant failed to provide *any* evidence, other than witness statements, to support the severity requirement. *See Black*, 2023 WL 4446500, at *5. He argued that he performed a home exercise plan, but without evidence of any prior formal physical therapy treatment, and also sought treatment after the gap only after Respondent raised severity as an issue in the case, and did not continue treating thereafter. *Id*. Here, Petitioner received early treatment, with documented shoulder findings and recommendations for further treatment; has provided a credible explanation for the gap in treatment; and continued to treat after the gap, including surgically.

The balance of evidence thus supports severity – although only *slightly*. The length of the gap is very troubling, especially since Petitioner could have returned to the orthopedist during this timeframe (given her willingness to seek other treatment in the interval). Her financial concerns are valid, but since it appears she had insurance coverage as of May or June 2022, her failure to seek treatment again is problematic. Given these facts, Petitioner should expect not only to receive a very modest pain and suffering award, but should calibrate her damages demand (which includes later shoulder surgery) in light of the fact that the long treatment gap allows for the possibility of injury exacerbation by other factors – and this is so *even* if no other intervening explanatory event can be identified. While SIRVAs involving surgery routinely result in pain and suffering awards in excess of $100,000.00, *no comparable award will be permitted in this case*.

### V.   Ruling on Entitlement

#### A.   *Requirements for Table SIRVA*

Respondent has not disputed Petitioner's proof on any of the QAI requirements for a Table SIRVA and there is no evidence to the contrary. Resp. at 5-9. Therefore, I find that Petitioner has provided preponderant evidence to establish that she suffered a Table SIRVA injury.

#### B.   *Additional Requirements for Entitlement*

Because Petitioner has satisfied the requirements of a Table SIRVA, she need not prove causation. Section 11(c)(1)(C). However, she must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D).

The vaccine record shows that Petitioner received a flu vaccine in her left arm on December 20, 2021. Ex. 3 at 3; Section 11(c)(1)(A) (requiring receipt of a covered vaccine). Additionally, Petitioner has stated that she has not filed any civil action or received any compensation for her vaccine-related injury, and there is no evidence to the

contrary. Ex. 4 at ¶5; Section 11(c)(1)(E) (lack of prior civil award). And as noted above, I have found that severity has been established. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Therefore, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation in this case. A separate damages order will be issued.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master